Argued and submitted September 23, convictions for felon in possession of a firearm reversed and remanded with instructions to enter a single conviction for felon in possession of a firearm and for resentencing; otherwise affirmed December 31, 2014

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

THOMAS LEE NUNES,
*Defendant-Appellant.*

Clackamas County Circuit Court
CR1200998; A152479

341 P3d 224

Erik M. Blumenthal, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Matthew J. Lysne, Senior Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Sercombe, Presiding Judge, and Hadlock, Judge, and Tookey, Judge.

HADLOCK, J.

**HADLOCK, J.**

In this criminal case, defendant appeals from a judgment convicting him of five crimes, including two counts of felon in possession of a firearm (FIP), ORS 166.270(1), arguing that the trial court erred in holding that the "anti-merger statute," ORS 161.067, prevented the two FIP counts from merging.[1] As explained below, we conclude that defendant could properly be convicted of only one count of FIP and, accordingly, reverse the two FIP convictions and remand for entry of a single FIP conviction and for resentencing.[2] We otherwise affirm.

The relevant facts, which are essentially undisputed for purposes of this appeal, are as follows. Defendant, a convicted felon, and L. Nunes, who retired from a career as a police officer in early 2012, were married for 18 years. Both parties described their marriage as troubled. In May 2012, Nunes moved from the master bedroom to an unfinished guestroom, where she slept on an air mattress.

Nunes possessed a revolver, which she had received as a retirement gift. Nunes testified that she kept the gun on one of the exposed ceiling beams in the guestroom, "pushed way back," so that her young grandson could not reach it. She also testified that, although defendant knew she had a gun in the house, she was trying to hide the gun from him and, as far as she knew, defendant did not know where she kept the gun. Defendant testified, however, that he had known that Nunes kept her revolver in the guestroom because it was easily visible from the doorway. Defendant reported that Nunes's adult son, who sometimes stayed with them, "advised her, because of [their] arguing and everything, that she should get the gun completely out of sight."

One day in June 2012, Nunes asked defendant to meet her at a bar because she was "try[ing] to fix some

---

[1] Defendant was convicted of one count of unlawful use of a firearm, ORS 166.220, two counts of FIP, ORS 166.270(1), one count of menacing constituting domestic violence, ORS 163.190, and one count of assault in the fourth degree constituting domestic violence, ORS 163.160(2).

[2] Defendant raised two additional assignments of error in his brief, but conceded those points at oral argument. We accept the concession and, accordingly, reject those assignments of error without further discussion.

things" with their relationship. After drinking at that bar, at their home, and at another bar, they ended the evening at a third bar located about six blocks from their home. At some point, while at the third bar, Nunes began to exchange text messages with another man. Defendant took Nunes's phone later that night, read the text messages, and decided to start the process of filing for divorce.

Nunes and defendant drove home separately. Nunes arrived first and went to sleep in the guestroom around 1:00 a.m. after barricading the door with furniture. When defendant arrived home, he forced the guestroom door open and turned on the light. Nunes was on the air mattress, under blankets, and defendant thought she was pretending to be asleep. Defendant walked over to the window, where he says he found her revolver in a holster. He testified that he grabbed the gun because he was angry about how easily accessible it was: "[I]t made me mad the whole time it was in there that it was in reach of [Nunes's grandson], mostly, and it was in sight for anybody." Defendant called Nunes some vulgar names and fired the gun at the air mattress. Defendant later testified that, although he was concerned that Nunes's grandson would find the gun, at the moment when he grabbed it and shot the air mattress, he was only attempting to wake Nunes up. Nunes explained that, although she heard a "really loud pop" and felt her air mattress deflate, she did not know that the sound was a gunshot. Nunes asked defendant to leave the room. Defendant left, but returned in less than a minute and began stomping and kicking Nunes's legs. After defendant left the guestroom for a second time, Nunes waited "until it got quiet" and then went into her grandson's room, locked the door, and went to sleep.[3]

Defendant went to the kitchen, loaded the revolver with a new round, and locked the gun in his truck underneath some blankets overnight. After taking cash from Nunes's purse and cutting up her credit cards and some other documents, defendant went to the master bedroom, where he stayed awake the rest of the night.

The next morning, Nunes went to the master bedroom to ask defendant for her phone. Defendant was awake

---

[3] The grandson was not in the home during the incident.

but refused to return the phone. Nunes returned to the guest-room, where she noticed that "[e]verything was thrown everywhere. All [her] stuff had been gone through." She testified that she had not noticed the night before because she was "a little freaked out" and "just went straight to bed." Nunes also testified that the "first thing that came to [her] mind when [she] saw [the state of her room] was, [she] better look for that gun. And it was gone." She explained that, although she was "freaked out" that defendant had her gun, she did not report it to the police because she was embarrassed.

Later that morning, defendant drove his truck, with the gun still inside, to the Oregon City Police Department, where Nunes had worked before retiring. He left the gun in the truck and went up to the window, rang the buzzer, and asked to speak to a supervisor. After waiting for approximately three minutes, he went back to his truck for a cigarette. At that point, defendant testified, he "thought that this would be a good time" to get the gun, so he holstered it under his pant leg before returning to the police department lobby.

Defendant was directed to Officer Schmierbach, who had known Nunes and defendant for approximately 11 years. Schmierbach testified that defendant seemed sad and "concerned about his relationship" with Nunes. Defendant explained to Schmierbach that the previous evening "he had been involved in a domestic [dispute] with *** Nunes where at one point he fired one round from a hand-gun and *** he had kicked her" legs. Schmierbach asked defendant, "Do you want to hurt yourself? Do you want to hurt anybody else[?]" Defendant responded that he wanted Schmierbach to take the gun "as safekeeping." Defendant then raised his right leg and showed Schmierbach that "there was a firearm in an ankle holster on his right ankle." Schmierbach suspected that defendant was a convicted felon and, after removing the gun from defendant's holster, had a colleague run a criminal-history check on defendant. To avoid any potential conflicts of interest due to his prior relationship with defendant and Nunes, Schmierbach contacted the Clackamas County Sheriff's Office and requested their assistance. Defendant later explained that he wanted to turn the gun in to the police because "he was afraid [that

Nunes] would use it against him" and he wanted "to get it out of the house and have it kept safely away from the house."

As relevant here, defendant was charged with two counts of FIP. The prosecution's theory was that defendant committed the first FIP offense when he fired the gun at Nunes and put the gun into his truck and that he committed the second FIP offense the next day when he retrieved the gun from his truck and walked into the police department. After a bench trial, the trial court found defendant guilty. In announcing its verdict, the trial court stated that defendant

"could have * * * locked the gun in the garage. He could have put it up in the top shelf of the cupboard in the kitchen and then gone to the police department and told them where it was. But no, he takes it with him in the car or vehicle, and then he goes into the police department, and then he goes back out and he straps it onto his leg underneath his jeans. The mind is boggled with that particular behavior.

"But clearly at that point, when he went back out to that car and strapped it on at that point, that was a separate felon in possession of a firearm. * * * He could have left it in the car. If he had left it in the car, I might have had a hard time with it. But I don't because he went back out there and he strapped it on, so I'm finding him guilty of [the second count of FIP]."

At sentencing, defendant argued that the two FIP counts at issue here should merge, or, alternatively, that the court should not impose consecutive sentences. The trial court agreed with defendant that it should not impose consecutive sentences, but did not state its reasoning for entering separate convictions on the two counts of FIP. Defendant appeals, renewing his merger argument.

ORS 161.067, the "anti-merger statute," governs the circumstances under which multiple guilty verdicts or a defendant's guilty or no-contest pleas to multiple criminal charges should merge into a single conviction. As pertinent here, that statute provides:

"(3) When the same conduct or criminal episode violates only one statutory provision and involves only one victim, but nevertheless involves repeated violations of the same statutory provision against the same victim, there

are as many separately punishable offenses as there are violations, except that each violation, to be separately punishable under this subsection, must be separated from other such violations by a sufficient pause in the defendant's criminal conduct to afford the defendant an opportunity to renounce the criminal intent."

We review the trial court's denial of defendant's merger request for legal error and are bound by the court's findings of historical fact if constitutionally sufficient evidence in the record supports them. *State v. Davis*, 265 Or App 425, 438-39, 335 P3d 322 (2014).

The crime of felon in possession of a firearm is defined by ORS 166.270(1), which provides:

"Any person who has been convicted of a felony under the law of this state or any other state, or who has been convicted of a felony under the laws of the Government of the United States, who owns or has in the person's possession or under the person's custody or control any firearm commits the crime of felon in possession of a firearm."

ORS 161.015(9) defines "possession" for purposes of ORS 166.270: "'Possess' means to have physical possession or otherwise to exercise dominion or control over property."

Defendant contends that, under ORS 161.067(3), he could be convicted of only one count of FIP because the state did not "show that at some point, defendant's first offense ended and the second began" and, therefore, the state failed to prove that defendant committed "repeated violations" of the FIP statute. In particular, defendant asserts that he first took possession of the gun when he picked it up in the guestroom after coming home from the bar and that his possession continued—and, consequently, did not end—until he surrendered the gun at the police department the following morning. Because he possessed the firearm only once, defendant argues, he did not commit "repeated violations" that were "separated * * * by a sufficient pause in the * * * criminal conduct" to prevent merger. ORS 161.067(3).

The state responds that the record supports the trial court's determination that defendant committed two separate FIP violations: one that occurred before defendant put the gun into the truck and one that occurred when

he retrieved the gun from the truck at the police department. According to the state, there was a "sufficient pause" between those two acts of possession to make them "separately punishable offenses" under ORS 161.067(3).

We agree with defendant that, as pertinent here, he committed only a single continuing act of FIP. That conclusion is based, in part, on the nature of the "possession" crime. Under ORS 161.015(9), a person may "possess" an item in either of two ways. First, the person may have "physical possession" of the item, which is customarily referred to as "actual possession." *State v. Fries*, 344 Or 541, 545, 185 P3d 453 (2008). "As a general rule, 'to have physical possession' of property means to have bodily or physical control of it." *Id.* at 546 (quoting ORS 161.015(9)). Alternatively, a person who does not actually possess an item may nonetheless constructively possess it if he or she "otherwise * * * exercise[s] dominion or control" over it. ORS 161.015(9); *Fries*, 344 Or at 547. A defendant may constructively possess an item either by actually exercising control over it, or by having the right to do so. *State v. Evans*, 161 Or App 86, 89, 983 P2d 1055 (1999). "At its core, constructive possession is a way to broaden the crime of possession beyond actual physical control." *State v. Casey*, 346 Or 54, 60, 203 P3d 202 (2009). As applied in this case, then, defendant "possessed" the firearm both when he physically possessed it and when he knowingly exercised control over the gun or had the right to control it.[4]

Moreover, possession of a firearm is a continuing offense. *State v. O'Dell*, 264 Or App 303, 310-11, 330 P3d 1261 (2014). The crime continues as long as the defendant has actual or constructive possession (or custody or control) of the firearm. Thus, a defendant who possessed a single firearm over a period of time has committed only a single act of possession unless there was a "pause" in the defendant's criminal conduct during which his or her possession of the weapon

---

[4] The FIP statute itself incorporates, at least to some degree, the concept of constructive possession, as it prohibits convicted felons both from possessing firearms and having firearms "under [their] custody or control." ORS 166.270(1). As was true in *State v. O'Dell*, 264 Or App 303, 307, 330 P3d 1261 (2014), this case "does not require us to explore the bounds of the interrelated (and perhaps indistinguishable) concepts of possession, control, or custody. That is because our case law is clear that ORS 166.270 criminalizes constructive as well as actual possession * * *." (Citations omitted.)

ceased and later resumed. *Id.* at 311. *Cf. State v. Gerlach*, 255 Or App 614, 624, 300 P3d 193, *rev den*, 353 Or 787 (2013) ("[K]idnapping is a continuing offense; it is not a discrete act that is complete once a defendant has committed all of the elements of the crime. \* \* \* [K]idnapping is committed continually while the defendant retains control of the victim.").

As noted, defendant contends that he possessed the gun continuously from when he took it from the guestroom until he brought it into the police department. The state's contrary argument appears to be premised on the notion that defendant intended to relinquish his possession of the gun when he placed it in his truck and, therefore, he stopped possessing the gun at that point, creating the "sufficient pause" between two acts of FIP.

The state's argument finds no support in the record. Certainly, there are circumstances in which a factfinder could determine that a defendant relinquished dominion and control over a firearm or other contraband by, for example, truly abandoning it. But the record includes no evidence that such relinquishment happened here. Defendant testified that he put the gun in the truck to "get it out of the house"—apparently out of concern that Nunes would hurt him—and covered it with a blanket in part to ensure that it would not be stolen. At no point did defendant suggest that he put the gun in the truck because he intended to divest himself of control over it. The most that a factfinder could infer from the evidence that defendant locked the gun in his truck overnight, then took it to the police department the next day, is that defendant intended to relinquish the gun *at some point in the future* when he put it in the truck. But given that defendant had locked the gun in his own truck, and given the absence of any evidence that defendant intended to relinquish control over the gun *at that point in time*, the record does not support a determination that defendant did not even constructively possess the gun while it remained in his truck overnight. *See, e.g., State v. Miller*, 238 Or 411, 413, 395 P2d 159 (1964) ("Knowledge by the driver of a car that there are concealable weapons in the car, available for the driver's use, is evidence of possession, custody or control of such weapons."); *O'Dell*, 264 Or App at 310-11 (locking four guns in a cabinet inside a room where the defendant

had access did not cease the defendant's possession); *State v. Kelley*, 12 Or App 496, 500, 507 P2d 837 (1973) ("To constitute possession of * * * a weapon under ORS 166.270, it is sufficient that [a] defendant have constructive possession and immediate access to the weapon to bring her within the statute."). In other words, no evidence supports a determination that there was a "pause" in defendant's possession. *See O'Dell*, 264 Or App at 311 (no "pause" in the defendant's continuing act of constructive possession over firearms, because there was no evidence that the defendant's "possession of * * * the weapons ceased and later resumed").

Nor did defendant's possession of the gun pause when he went into the police department the first time the next morning, briefly leaving the gun in the truck again. At that point, defendant still maintained constructive possession for the same reasons as discussed above—he had the keys to the truck and could immediately access the gun if desired. When he returned to the truck and strapped the gun in a holster onto his ankle, he regained actual possession of the gun. However, defendant did not begin a new possession of the gun; rather, he continued the possession that had begun the night before.

In sum, we conclude that the record supports only one determination: that defendant continuously possessed the gun from the time he obtained it in the guestroom until he surrendered it to the police. In other words, defendant did not commit repeated FIP violations that were separated by a "sufficient pause." Accordingly, ORS 161.067(3) does not prevent merger of the two counts of FIP.[5]

Convictions for felon in possession of a firearm reversed and remanded with instructions to enter a single conviction for felon in possession of a firearm and for resentencing; otherwise affirmed.

---

[5] The state argues in the alternative that the FIP counts cannot merge because they occurred during separate criminal episodes. *See* ORS 161.067(3) (describing circumstances under which merger of repeated criminal violations is precluded even though they were involved in *"the same * * * criminal episode"* (emphasis added)). But the state bases that argument on its assertion that a "lapse in time" occurred between defendant's "separate acts of possessing the handgun." As we have explained above, no such lapse occurred.